NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 17a0490n.06

No. 16-1441

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

JENNIFER GALVAN,                                     )
                                                     )
    Petitioner-Appellant,                        )
                                                     )
v.                                                   )    ON APPEAL FROM THE
                                                     )    UNITED STATES DISTRICT
ANTHONY STEWART, Warden,                             )    COURT FOR THE EASTERN
                                                     )    DISTRICT OF MICHIGAN
    Respondent-Appellee.                         )
                                                     )
                                                     )

BEFORE:    SUHRHEINRICH, GILMAN, and McKEAGUE, Circuit Judges.

SUHRHEINRICH, Circuit Judge.

Petitioner Jennifer Galvan appeals the district court's denial of her § 2254 habeas petition, asserting that the Michigan Court of Appeals unreasonably applied *Jackson v. Virginia*, 443 U.S. 307 (1979), in holding that there was sufficient evidence in support of her Michigan first-degree felony murder conviction. We affirm.

**I.**

Petitioner and Joe Galvan (Petitioner's husband) were both charged with first-degree felony murder, Mich. Comp. Laws § 750.316(1)(b), based on the predicate felony of first-degree child abuse, Mich. Comp. Laws § 750.136b(2), or torture, Mich. Comp. Laws § 750.85, which resulted in the death of Joe's biological daughter, and Petitioner's step-daughter, Prhaze Galvan.

At a joint trial, a jury found both Petitioner and Joe guilty.[1] Both Petitioner and Joe appealed, challenging, among other things, the sufficiency of the evidence sustaining their convictions. We repeat verbatim the relevant facts as found by that court, which we presume correct on habeas review. *See* 28 U.S.C. § 2254(e)(1).

> Prhaze Galvan died on January 15, 2010. The medical examiner, Daniel Spitz, M.D., concluded that the death was a homicide and that she died of "multiple blunt force head injuries." More specifically, Dr. Spitz concluded that she died of "impact involving the right side of the head," which resulted in "injury to the brain, bleeding over the surface of the brain, and then the reaction of the brain to that bleeding which is brain swelling." Dr. Spitz noted that Prhaze had injuries and bruising all over her body in various stages of healing. The injuries included pattern injuries, several of which were caused by "a white plastic spatula type spoon with a fairly long handle." Dr. Spitz estimated that there were 20 or more injuries to her head and neck. Defendants initially reported that Prhaze had fallen in the bathroom and hit her head. However, Dr. Spitz and a pediatric expert both concluded that the bathtub injury story "didn't fit" and could not account for the type of trauma that existed.

> Other evidence indicated that the abuse had been unrelenting. Defendant Jennifer Galvan's sister, Kathleen LaFave, had on one occasion seen Prhaze with two black eyes, on another with one black eye, and on still another saw her with a bruise that covered her whole butt cheek. On another occasion she discovered Prhaze in the shower in her clothes; defendant Jennifer Galvan explained that she had wet her pants. Another sister witnessed a scabbed chin with a mark by her eye, a bruise on her lower back and blackened eyes. John Mugnano, a longtime friend of defendant Jennifer Galvan who sometimes watched Prhaze, said that "[a]nytime that I ever had her her left eye was black or her right eye was black." Further, he once observed Prhaze standing with her nose to the wall for 30 to 40 minutes. Mugnano testified that defendant Jennifer Galvan dropped Prhaze off at his home and asked for masking tape. After Jennifer left his home, he called out to Prhaze, but she did not answer. He found Prhaze with her mouth, arms, and knees taped together. He later made an anonymous report to Child Protective Services because he did not see the couple's treatment of Prhaze improving.

> Defendant Jennifer Galvan's mother twice saw Prhaze with black eyes; Jennifer explained that on one occasion she fell in the tub. She also noted a bruise on Prhaze's hip and one on her butt. A babysitter, noted "[b]lack eyes, like horrible bruises like on her head," including "a tennis ball swelling out of her head," and bruising "[o]n her butt. Bruises everywhere," including her arms, legs, thighs and

---

[1] Michigan has abolished the distinction between being the principal offender versus aiding the abetting the principle offender. Mich. Comp. Laws § 767.39. Thus, neither Petitioner nor Joe were charged or convicted specifically as principals or as aiders and abettors.

back. On one occasion, Prhaze explained the presence of a bruise by saying she had been spanked with a spoon when she tried to get out of a cold shower. When family members questioned defendant Jennifer Galvan about the condition of the child, she claimed that the child was clumsy and received bruises from playing with the family puppy. Other family members never saw Prhaze after they complained about the child's condition.

There was also evidence that Prhaze was not being fed. She weighed 32 pounds 14 months before her death and 32 pounds at the time of death. Indeed, family members testified that Prhaze frequently woke up at night and would search the home, even the garbage can for food. As a result, defendant Jennifer Galvan would withhold meals from the child as a punishment. The couple would force their children to face a wall as a form of punishment. Witnesses testified that Prhaze was consistently on punishment and for extended periods of time. There was also testimony that defendant Jennifer Galvan's biological children were not dressed or treated the same as Prhaze. Also, witnesses observed Prhaze transform during the course of the ongoing abuse from a happy child to a child who was withdrawn, non-interactive, not playful, and "emotionless."

Defendant Jennifer Galvan was a licensed practical nurse. Her co-workers testified that Jennifer hated Prhaze, referred to the child as the devil, blamed Prhaze for the death of the couple's infant son, and claimed that the child was ruining her marriage. Defendant Jennifer Galvan testified in her own defense and denied the claims raised by family, friends, and coworkers. She asserted that she loved Prhaze and claimed that the witnesses were mistaken or misconstrued her statements. She denied ever calling Prhaze the devil, but rather mentioned that the child would dress as the devil for Halloween. Additionally, she denied withholding meals from the child as a form of punishment or that the duration of time standing at the wall was ever excessive. She also denied ever tying or restraining the child. However, when confronted with a text that she sent to defendant Joe Galvan wherein she purportedly referred to Prhaze as an expletive brat who could walk while tied up, she could not recall what the text meant. Rather, defendant Jennifer Galvan questioned the conduct of babysitters and family members, claiming that one family member left Prhaze on the porch at night. Defendant Joe Galvan did not testify, but his history of abuse with Prhaze's half-brother and others was presented during trial, and his admission to hitting Prhaze with a belt to defendant Jennifer Galvan's co-worker was admitted at trial.

*People v. Galvan*, Nos. 299814, 299822, 2013 WL 5338520, at *1-2 (Mich. Ct. App. Sept. 24, 2013) (per curiam).

Like the district court, we also take particular note that first responders testified that Petitioner showed little to no concern for Prhaze's condition upon their arrival; and that, when

initially questioned on the scene by a detective, Petitioner's first instincts were to ask whether she needed an attorney, and to manufacture defenses for Prhaze's injuries.

Furthermore, we highlight the fact that Petitioner's mother, sisters, and friend testified that, when they first met Prhaze, she was a normal, happy child, and that Petitioner treated Prhaze lovingly, just like her other children.[2] They all stated that it was only after the death of Petitioner and Joe's son, Joe Jr., that Petitioner and Joe began to treat Prhaze differently. It was then that Petitioner told them that she didn't want to have Prhaze anymore; that she couldn't stand to look at Prhaze; that Prhaze was a devil child; that she hated Prhaze; that she wished Prhaze had died instead of Joe Jr.; and that she blamed Prhaze for Joe Jr.'s death.

Lastly, we summarize Petitioner's version of events on January 15, 2010. Petitioner testified that she arrived home from her night shift as a licensed practical nurse around 8:15 A.M. After doing a few household chores, she went into the master bedroom, around 9:15 or 9:30 A.M., and found Joe there in bed, and Prhaze standing with her nose against the wall—a standard punishment for Prhaze. Petitioner then went to sleep. Petitioner woke at 10:30 A.M., and went to pick up her daughter C.G. from kindergarten around 11:15 A.M. Before she left, Joe told Petitioner that he was going to make Prhaze some food and put her down for a nap. Petitioner and C.G. arrived back home at 12:15 or 12:20 P.M. Petitioner and C.G. then watched TV in the living room next to the master bedroom and dozed off until 2:30 P.M. Petitioner claimed that she didn't see Prhaze during that two-hour stretch. After she got up, Petitioner and C.G. put their coats on and Petitioner opened the door to her bedroom and told Joe that she was going to go pick up her other children, B.G. and A.G. Petitioner said that she knew Prhaze had wet herself, that Joe was going to make her take a shower, and that Petitioner could hear the shower running.

---

[2] Petitioner had three of her own children from a previous relationship as well: A.G., B.G., and C.G. These names are redacted pursuant to Fed. R. Civ. P. 12. Prhaze's is not, however, because she is deceased, and her name was used in state court proceedings and the district court's opinion.

Petitioner testified that when she got to the car, she heard Joe scream and she ran back inside to find Prhaze on the floor of the master bathroom. Joe then carried Prhaze into the bedroom, and Prhaze puked onto Petitioner. Petitioner claimed she then performed CPR on Prhaze until the paramedics arrived, at around 2:54 P.M.

The Michigan Court of Appeals affirmed both convictions. In reviewing whether there was sufficient evidence (i.e., probable cause) to bind Petitioner over on the charge of open murder (which was later dropped), the court unanimously found that:

> Dr. Spitz's testimony was competent to establish that someone abused this child causing her death. Moreover, there was evidence giving rise to a reasonable suspicion that defendant Jennifer Galvan encouraged the fatal blow. Accepting for purposes of discussion the version of events that defendants gave to police, Prhaze was injured when she was told to get in the shower after wetting her pants, and defendant Jennifer Galvan was present at this point. There was evidence that Prhaze was punished with cold showers, while clothed, for wetting her pants. Furthermore, defendant Joe Galvan had previously beat her with a belt resulting in welts on her bottom, and the child had injuries in various stages of healing indicative of acute and chronic child abuse. There was testimony that defendant Jennifer Galvan hated Prhaze, withheld meals from the child, forced the child to put her nose against the wall for long periods, forced the child to take cold showers, and bound the child's hands, knees, and mouth with masking tape. There was also evidence that someone had spanked her with a spoon for trying to get out of a cold shower, and that she was repeatedly seen with bruising, including many black eyes. This evidence, coupled with defendant Jennifer Galvan's inferred presence in the home at the time the fatal injury was sustained, was sufficient to create an inference that she was complicit with respect to the "discipline" that led to the fatal injury. . . .
>
> Presuming defendant Joe Galvan inflicted the fatal injuries, defendant Jennifer Galvan's history of abuse and/or encouragement and tolerance of abuse, coupled with knowledge that defendant Joe Galvan was going to "discipline" the child for wetting her pants in a manner consistent with the past, gave rise to an inference that she had knowledge he intended to abuse or torture Prhaze. A natural and probable consequence of the abuse and torture was that defendant Joe Galvan might escalate the assault into a murder. Thus, there was sufficient evidence for the bindover.

*Id.* at *4-5.

On the issue of whether there was sufficient evidence to support Petitioner's conviction, the court split. The majority, affirming the verdict, found that:

> Consistent with the preliminary examination testimony, Dr. Spitz testified that the injury was probably within minutes to an hour but could have occurred up to eight hours earlier and that Prhaze would have been symptomatic during this time. The first responder noted that her eyes were "open, extremely dilated, nonmoving," that her color was monotone or gray, which is a sign of shock and "a late sign in the body" and "it takes a while to get to that point," and that it "definitely indicates she was down for awhile." The EMT who greeted her at the ambulance did not believe she was alive at first because she was pale, limp, not moving, and had dilated and non-reactive pupils. Also, her sclera was drying. The EMT indicated that the sclera is usually wet in a patient who has just died but will be dry in a patient who has been dead for hours or longer. Defendant Jennifer Galvan indicated to an investigator that she had been home that morning, stating that she had left out toast and jam for Prhaze for breakfast although she did not know if Prhaze ate it. Moreover, she reported to the same investigator that she was getting ready to pick her kids up from school when she heard defendant Joe Galvan screaming and "came back" inside, suggesting she had been home immediately beforehand. Given her own indication that she had been there on the morning in question, coupled with evidence that the injury occurred well before responders arrived, there was sufficient evidence to give rise to an inference that she was present at the time of the injury. Irrespective of her statement regarding her location at the time of the fatal injury, the credibility of that assertion presented an issue for the trier of fact. . . .
>
> Moreover, even if she did not inflict the fatal blow, given the extensive evidence of ongoing abuse in the household and her mistreatment of the child, coupled with her disdain for the child, an inference arises that she was complicit in the abuse, a natural consequence of which would be death.

*Id.* at *11. Judge Shapiro dissented, finding insufficient evidence that Petitioner "participated, or assisted, in the assault on January 15, 2010, or that any of the incidents of abuse before that date caused Prhaze's death." *Id.* at *15.

After an unsuccessful application for leave to appeal to the Michigan Supreme Court, *see People v. Galvan*, 843 N.W.2d 749 (Mich. 2014) (unpublished table decision), Petitioner filed this federal habeas petition,[3] raising a number of challenges to the Michigan Court of Appeals'

---

[3] Joe did not join Petitioner in filing this petition.

decision. The District Court rejected them all, and issued a certificate of appealability only on the sufficiency–of–the–evidence claim.

## II.

## A.

We review a district court's denial of a petition for a writ of habeas corpus de novo. *Adams v. Bradshaw*, 826 F.3d 306, 309 (6th Cir. 2016). Because the Michigan Court of Appeals adjudicated Petitioner's sufficiency–of–the–evidence claim on the merits, the Antiterrorism and Effective Death Penalty Act (AEDPA), 28 U.S.C. § 2254, applies, making our scope of review extremely narrow and "doubl[y] deferen[tial]." *See Davis v. Lafler*, 658 F.3d 525, 535 (6th Cir. 2011) (en banc).

First, we must defer to the jury. We must assume that the jury weighed the evidence, resolved conflicts in the testimony, and drew reasonable inferences in favor of the prosecution. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). We do not reweigh the evidence or redetermine the credibility of witnesses. *Marshal v. Lonberger*, 459 U.S. 422, 434 (1983). Circumstantial evidence is entitled to the same weight as direct evidence, *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100 (2003), and is sufficient to support a conviction as long as the jury is convinced of guilt beyond a reasonable doubt, *see Holland v. United States*, 348 U.S. 121, 140 (1954); *see also Tucker v. Palmer*, 541 F.3d 652, 657 (6th Cir. 2008) (and cases cited therein).

Second, we also defer to the Michigan Court of Appeals' determination that, per *Jackson*, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." 443 U.S. at 319. Habeas relief is available only if this conclusion is "objectively unreasonable." *Cavazos v. Smith*, 565 U.S. 1, 2 (2011) (per curiam). That is, we must respect the state court's decision

"so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). Stated differently, only if *every* fairminded jurist would agree, after construing the evidence in the light most favorable to the prosecution, that there was insufficient evidence to convict Petitioner, may we grant relief. *See id.* This is an extremely high bar.

Although Petitioner's sufficiency–of–the–evidence claim is grounded in the Fourteenth Amendment, *Jackson*'s standard must be applied with "explicit reference to the substantive elements of the criminal offense as defined by state law." *Jackson*, 443 U.S. at 324 n.16. Petitioner was charged with being a principal or an aider and abettor in the felony murder of Prhaze. This charge involves several component crimes.

The principal crime is felony murder, the elements of which are:

(1) the killing of a human being, (2) with the intent to kill, to do great bodily harm, or to create a very high risk of death or great bodily harm with knowledge that death or great bodily harm was the probable result[,] i.e., malice, (3) while committing, attempting to commit, or assisting in the commission of any of the . . . specifically enumerated [predicate felonies] in M[ich]. C[omp]. Laws § 750.3161(1)(b) . . . .

*People v. Smith*, 733 N.W.2d 351, 365 (Mich. 2007) (internal brackets omitted).

Among these predicate felonies are first-degree child abuse and torture. *See* Mich. Comp. Laws § 750.3161(1)(b). "A person is guilty of child abuse in the first-degree if the person knowingly or intentionally causes serious physical or serious mental harm to a child." Mich. Comp. Laws § 750.136b(2). This is a specific intent crime. *People v. Maynor*, 662 N.W.2d 468, 471 (Mich. Ct. App. 2003). "Serious physical harm" is "any physical injury to a child that seriously impairs the child's health or physical well-being, including, but not limited to, brain damage, a skull or bone fracture, subdural hemorrhage or hematoma, dislocation, sprain, internal injury, poisoning, burn or scald, or severe cut." Mich. Comp. Laws § 750.136b(1)(f).

A person is guilty of torture if the person "with the intent to cause cruel or extreme physical or mental pain and suffering, inflicts great bodily injury or severe mental pain or suffering upon another person within his or her custody or physical control." Mich. Comp. Laws § 750.85(1). An "internal injury" meets the standard of "great bodily injury" for the purpose of torture. *Id.* § 750.85(c)(ii).

Under Mich. Comp. Laws § 767.39, to support a finding that a defendant aided and abetted in the commission of a crime, the prosecutor must show that: "(1) the crime charged was committed by the defendant or some other person, (2) the defendant performed acts or gave encouragement that assisted the commission of the crime, and (3) the defendant had knowledge that the principal intended its commission at the time he gave aid and encouragement." *People v. Carines*, 597 N.W.2d 130, 135 (Mich. 1999). "'Aiding and abetting' describes all forms of assistance rendered to the perpetrator of a crime and comprehends all words or deeds that might support, encourage, or incite the commission of a crime." *Id.* A defendant's close association with the principal, and the defendant's participation and planning of the crime, are factors to be considered. *Id.* Although mere presence is insufficient, even with knowledge of the offense, being present and giving silent moral support is enough. *Sanford v. Yukins*, 288 F.3d 855, 858, 862-63 (6th Cir. 2002). To be found guilty of aiding and abetting felony murder, the accomplice must have had the same *mens rea* as that required of the principal, that is, malice. *People v. Barrera*, 547 N.W.2d 280, 297 (Mich. 1996).

Thus, for Petitioner to have been found guilty, she must have directly participated in the fatal child abuse or torture of Prhaze on January 15, 2010, or aided and abetted Joe in committing the fatal child abuse or torture, and in doing so, intended to kill, do great bodily harm to, or create a very high risk of great bodily harm for, Prhaze. We conclude that, at a minimum,

a reasonable jury could find that Petitioner aided and abetted Joe in the fatal abuse on January 10, 2015, because she was complicit in the discipline that led to Prhaze's death.

**B.**

Petitioner argues that there is insufficient evidence to prove the necessary elements to sustain her conviction. Specifically, she claims that she was not present when the fatal blow was struck, and that she did not otherwise participate in the abuse of Prhaze that led to Prhaze's death on January 10, 2015. In essence, she argues that there is insufficient evidence to support the *actus reus* or the *mens rea* of aiding and abetting felony murder predicated on child-abuse or torture. We disagree.

First, Petitioner performed acts or gave encouragement that assisted in the fatal abuse, with the knowledge that Joe was going to abuse Prhaze, the required *actus reus*. According to Petitioner's own testimony, on January 15, 2010, she was home for the majority of the day. That morning, after arriving home from her job as a *licensed practical nurse*, instead of ensuring that her starving step-child ate, Petitioner merely set out only toast with jam on the counter, leaving it up to three year-old Prhaze to feed herself.[4] Petitioner also admittedly witnessed Joe punishing Prhaze by having her stand with her nose to the bedroom wall for an extended period of time. She did not intervene, and instead took a nap. Later, around 2:30 PM, just before leaving to pick up her other children, Petitioner observed that Joe was punishing Prhaze with a cold shower for having wet herself—a punishment that in the past had led to beatings. Again, she chose not to intervene, allowing the ultimately fatal abuse to proceed.

Michigan has a broad definition of "aiding and abetting," which includes "*all* forms of assistance rendered to the perpetrator of a crime and comprehends all words or *deeds* that might

---

[4] According to the medical testimony, Prhaze had not gained a pound for over the year, and numerous witnesses testified that they had seen Prhaze eating out of the garbage. Jam and toast are simple carbohydrates, not suitable for a starving child. This indicates that Petitioner was actively participating in abuse or torture on January 10, 2015.

support, encourage, or incite the commission of a crime." *Carines*, 597 N.W.2d at 135 (emphases added). This "easily encompasses situations where the alleged aider and abettor, although silent and not committing acts directly related to the crime, was not 'merely' present, but providing emotional encouragement and support. This is true particularly where, as here, the person present is the mother, and has beaten the victim in the past." *Sanford*, 288 F.3d at 862. Thus, even if Petitioner did not say anything else to Joe when she allegedly was going to pick up her other children, or strike the fatal blow herself, given these facts—and especially the close relationship between Petitioner and Joe and the extensive history of their joint abuse—this rises to the level of silent moral support, which is sufficient to show aiding and abetting. *Id.* at 863. In the words of the District Court (albeit in the context of determining probable cause to bind Petitioner over for trial), all of this evidence "was sufficient to create an inference that [Petitioner] was complicit with respect to the 'discipline' that led to the fatal injury." *Galvan*, 2013 WL 5338520, at \*4.

Second, the evidence supports the inference that Petitioner intended Prhaze to suffer great bodily harm during the fatal abuse, the required *mens rea*. One witness testified how Prhaze had told the witness how she was beaten for trying to get out of a cold shower. In aiding Joe in giving Prhaze a cold shower for wetting herself, Petitioner therefore knew that great bodily harm was a natural and probable consequence of initiating this punishment, especially considering that Prhaze was an extremely malnourished three–year-old who had suffered chronic physical and psychological abuse for over a year. Furthermore, as the Michigan Court of Appeals and District Court found, the history of abuse, and Petitioner's statements about how much she hated Prhaze, demonstrated that Petitioner consistently and continuously intended Prhaze to suffer great bodily harm. For example, Petitioner told a number of people how much she hated Prhaze, blamed her

for Joe Jr.'s death, and wished Prhaze had died instead of Joe Jr.; after Joe Jr.'s death, Petitioner and Joe jointly and systematically abused and starved Prhaze for over a year; as a three year old, Prhaze did not gain a pound in fourteen months; Prhaze had deep bruising all over her body; Petitioner and Joe frequently gave this three-year-old black eyes and head lacerations; they would bind, gag, and leave her alone in a room as a form of punishment, and would instruct others watching Prhaze to do likewise. Consequently, Petitioner's knowledge of the natural and probable consequence of the shower punishment, combined with this history of abuse, torture, and hatred, supported the jury's influence that Petitioner intended that the abuse occurring on January 15, 2010 would cause Prhaze great bodily harm.[5]

As the Michigan Court of Appeals and the District Court held, the evidence supported the jury's conclusion that Petitioner intended that Joe cause great bodily harm to Prhaze, Petitioner encouraged Joe in carrying out the abuse, and the abuse resulted in Prhaze's death. This is all that is required for sustaining a conviction for aiding and abetting felony murder predicated on first-degree child abuse or torture in Michigan. *See Smith*, 733 N.W.2d at 365; *Carines* 597 N.W.2d at 135.

Petitioner argues, however, that she could not have aided and abetted because (contrary to the finding of the Michigan Court of Appeals) there is no evidence that she was present for the fatal blow. Putting aside the question of whether there was evidence of Petitioner's presence for the fatal blow, under an aiding and abetting theory, Petitioner need not have actually been

---

[5] Petitioner argues on appeal that the history of past abuse of Prhaze was impermissible prior bad-acts evidence. The District Court did not grant a certificate of appealability on this challenge, but only on the sufficiency of the evidence. Nonetheless, as the Michigan Court of Appeals and the District Court both held, the evidence of past abuse here was proper *res gestae* evidence and proper for the jury—and us—to consider. *See People v. Knox*, 674 N.W.2d 366, 370 (Mich. 2004) (quoting *People v. Sabin (After Remand)*, 614 N.W.2d 888, 899 (Mich. 2000) ("[E]vidence of similar misconduct is logically relevant to show that the charged act occurred where the uncharged misconduct and the charged offense are sufficiently similar to support an inference that they are manifestations of a common plan, scheme or system.").

present. Rather, she need only have given aid or encouragement in the abuse, knowing that Joe intended to commit first-degree child abuse or torture, and that abuse must have resulted in Prhaze's death. *See Carines*, 597 N.W.2d at 135. In other words, under this theory, she is guilty if she went to the bedroom, aided or encouraged the abuse, and then left the room before it actually occurred and resulted in Prhaze's death. As discussed above, there was sufficient evidence that she aided or encouraged the fatal abuse.

The cases that Petitioner cites do not help her. In *Brown v. Palmer*, while sitting in the driver's seat at a Detroit gas station, the petitioner's passenger, who petitioner claimed to have met only minutes before when he offered to give him a ride, got out of the car, fired shots at another individual and stole that individual's car. 441 F.3d 347, 349 (6th Cir. 2006). This court granted habeas relief and held that, even under AEDPA's deferential standard of review, evidence showing only the petitioner's presence and mere acquaintance with the passenger was insufficient to support a theory that petitioner aided and abetted his passenger. *Id.* at 351-52. Here, by contrast, Petitioner and Joe were not mere acquaintances, but spouses who coordinated their "care" of Prhaze on a daily basis. Furthermore, there was substantial evidence that they jointly and systematically abused Prhaze for over a year, and that, on the day in question, Petitioner knew that Joe was engaging in the child abuse that led to Phraze's death, and she supported Joe in committing that abuse. Thus, unlike *Brown*, here the jury's conclusion that Petitioner aided and abetted Joe was not "speculative." *See id.* at 351.

In *State v. Maupin*, the Tennessee Criminal Court of Appeals overturned the aiding and abetting first-degree murder conviction of a mother who was at work when her live-in boyfriend beat her two-year-old son for wetting himself, and where the blows ultimately killed the boy. No. 272, 1991 WL 197420, at *1 (Tenn. Crim. App. Oct. 7, 1991). Extensive testimony showed

that the boyfriend abused the son, but not the defendant, and because the crime there was first-degree murder, the state had to prove that the defendant intended the death of her son. *Id.* at *1-2. Here, the evidence indicated that Petitioner was present immediately before—if not during—the fatal abuse. Further, because the crime in this case was felony murder based on first-degree child abuse or torture, the state needed to show only that Petitioner, in aiding or encouraging the fatal abuse, had the intent to cause great bodily harm to Prhaze. Thus, *Maupin* is distinguishable.

Nor does this court's recent decision in *Tanner v. Yukins,* No. 15-1691, 2017 WL 3481867 (6th Cir. Aug. 15, 2017), persuade us that sufficient evidence is lacking in this case. In *Tanner*, the State failed to present any evidence that the defendant herself murdered the victim (as a principal) or helped the principal commit the fatal assault (as an aider and abettor). Slip op. 16-17. The "three pieces of inculpatory evidence" that the State presented—the defendant's admission that she was in this parking lot of the building when the murder occurred, her statements that the murder weapon was hers, and blood near the scene matching her blood type—established at most "reasonable speculation" that she was *present* at the scene of the murder. Slip op 16-17. Here, however, overwhelming evidence supported Petitioner's conviction under the aiding and abetting theory. The testimony from the medical personnel placed Petitioner inside the home at the time of Prhaze's murder and Petitioner admitted that she was present. Combined with the longstanding history of Petitioner encouraging Joe to abuse Prhaze, a reasonable jury could find the elements of felony murder were satisfied beyond a reasonable doubt. *See Davis*, 658 F.3d at 533.

**III.**

The jury and the Michigan Court of Appeals determined that there was sufficient evidence to support Petitioner's convictions. Like the District Court, we do not find this conclusion objectively unreasonable. Therefore, we affirm the judgment of the District Court.