RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 24a0085p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────

HATTIE TANNER,

        *Plaintiff-Appellee*,

    *v.*

DAVID A. WALTERS,

        *Defendant-Appellant*.

No. 22-1963

─────────────

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:19-cv-00849—Hala Y. Jarbou, District Judge.

Argued: July 26, 2023

Decided and Filed: April 15, 2024

Before: SUTTON, Chief Judge; DAVIS and MATHIS, Circuit Judges.

─────────────

## COUNSEL

**ARGUED:** Joel C. Bryant, MILLER, CANFIELD, PADDOCK, AND STONE, P.L.C., Ann Arbor, Michigan, for Appellant. Wolfgang Mueller, MUELLER LAW FIRM, Novi, Michigan, for Appellee. **ON BRIEF:** Joel C. Bryant, MILLER, CANFIELD, PADDOCK, AND STONE, P.L.C., Ann Arbor, Michigan, for Appellant. Wolfgang Mueller, MUELLER LAW FIRM, Novi, Michigan, for Appellee.

─────────────

## OPINION

─────────────

DAVIS, Circuit Judge. After serving seventeen years in prison for murder, Plaintiff Hattie Tanner gained her freedom when this court granted her habeas relief and set aside her conviction, finding that it lacked sufficient evidentiary support. Once released from custody,

Tanner filed a lawsuit under 42 U.S.C. § 1983 against Defendant David Walters, a since-retired police detective who she says violated her constitutional rights by falsifying investigation reports and testifying falsely to obtain her wrongful conviction. Walters moved for summary judgment based on qualified immunity, which the district court granted in part and denied in part. Specifically, the district court found that Tanner's claims for fabrication of evidence and malicious prosecution should proceed to trial. Walters now appeals the district court's partial denial of his motion. For the reasons that follow, we AFFIRM.

**I.**

The facts underlying Tanner's murder conviction were well documented in this court's prior decision granting her habeas relief. *See Tanner v. Yukins*, 867 F.3d 661, 663 (6th Cir. 2017). Here, we limit our discussion to the facts pertinent to the issues raised in this appeal. In the early morning hours of March 22, 1995, Sharon Watson was fatally stabbed at Barney's Bar and Grill in Calhoun County, Michigan. *Id.*; *see also People v. Tanner*, 660 N.W.2d 746, 751 (Mich. Ct. App. 2003). Watson was a bartender at Barney's who was attacked during an apparent robbery. *Tanner*, 867 F.3d at 663. Walters, who was then employed by the Battle Creek Police Department ("BCPD"), was the lead detective assigned to Watson's murder. He investigated Tanner, Dion Paav, and Robert Cady as primary suspects for Watson's death. *Id.* at 664. As part of his investigation, Walters interviewed Tanner twice within a couple of months of the murder.

*First Tanner Interview.* Walters first questioned Tanner on May 24, 1995, in an investigation room at the police department. Walters recorded the interview and later completed a summary report about it. The transcript of the interview indicates that many of Tanner's words were inaudible. In addition to equipment issues the detective bureau was experiencing at the time, there is some indication that Tanner spoke in a manner and speed that may have been difficult to understand. Despite these hurdles, Walters understood Tanner well enough to engage her in dialogue for at least half an hour.

The following is a summary of the pertinent parts of the May 24 interview. Tanner stated toward the beginning of the interview that she had not been to Barney's in about three years.

She relayed that Cady, her long-time friend, had visited her home in the hours leading up to the murder. She and Cady decided to drive around in Cady's car to search for drugs. After about 30 minutes of driving, their search paid off and they returned to Tanner's home to get high. Tanner relayed that Cady later left her home to go cash a check for money to buy more drugs. Walters then repeatedly asked Tanner whether she rode in the car with Cady that night to cash the check. Consistent with her later trial testimony on this point, Tanner maintained that she did not.

During the interview, Walters also showed Tanner a picture of the murder weapon and asked if she had seen it before. Tanner responded that she was not sure but thought it "look[ed] like one of [her] knives." (R. 93-6, PageID 783). Walters asked Tanner if it was her knife and she indicated that it was not. He then asked if she "[c]ould . . . have ever had a knife like that," and Tanner responded that she "used to have something like that (INAUDIBLE) in [her] back pocket." (*Id.* at 784). A short time later, Walters asked Tanner whether she killed Watson. Tanner denied doing so and stated that she did not "even know her" or "what [Watson] look[ed] like." (*Id.*).

At the end of the interview, Walters also asked Tanner if he would find her fingerprints on the knife he had shown her or in Barney's and she responded, "No." (*Id.* at 786). Tanner explained that someone had called and told her about the murder the night it happened, but that she was not aware that it had just happened or even where it occurred.

*Second Tanner Interview.* Walters interviewed Tanner again about two weeks later, on June 7, 1995. This time, Walters talked to Tanner while he and another BCPD detective, David Adams, drove her to a scheduled polygraph examination. Walters did not tape this interview or ask Tanner to provide a written statement afterwards. He did, however, summarize his account of the interview in a report titled, "Investigation Notes." According to Walters's investigation notes, Tanner told him and Adams that she remembered admitting, during the May 24 interview, that she owned the murder weapon. His investigation notes also indicate that Tanner said the officers would find both her fingerprints and Paav's on the knife because they had used it about a week before Watson's murder to do drugs together. Walters also wrote that Tanner stated she was certain the knife was hers based on the way it was filed and chipped because she would sharpen her knives that way to clean her drug paraphernalia and do small home repairs. After

speaking with Walters for over two hours, Tanner submitted to a polygraph examination the results of which led the polygraph examiner to opine that Tanner was not being truthful. Relevant here, none of Tanner's answers to the five "test" questions central to the investigation matched Walters's recounting of her statements from the second interview. Rather, Tanner answered each of the five central polygraph questions with responses consistent with her recorded and transcribed interview responses from May 24, 1995.

*Former Prosecutor Declines to Charge Tanner.* As the investigation progressed, in June 1995, Tanner's former cellmate from the county jail, Constance Roberts, told police that Tanner had admitted to her that she was at Barney's the night leading to the murder. And a few months later, in September 1995, the police crime lab reported that Tanner was "included in the population of possible donors to the blood stain detected on the bar sink" near the crime scene. (R. 93-7, PageID 798). Walters attached the lab report to an arrest warrant request he submitted to the prosecutor's office; the chief assistant prosecutor at the time declined the request due to insufficient evidence. Walters's investigation notes span from June to October of 1995. In 1997, he was promoted to sergeant and was no longer assigned to the Watson murder investigation team.

*New Prosecutor Charges Tanner.* By 2000, a new prosecutor had taken office, and after reviewing the Watson murder file, he authorized charges against Tanner. Michigan's Tenth District Court for the County of Calhoun held a preliminary examination hearing ("P.E.") to determine whether there was probable cause to order Tanner bound over for trial. Cady testified at the P.E. that he drove to Barney's that night, but Tanner stayed home. Walters testified about his involvement in the investigation, including his two interviews with Tanner. His testimony about the May 24 interview differed in important ways from the interview transcript. For instance, Walters testified that Tanner admitted during the May 24 interview that she owned the murder weapon and that she described why and how it was chipped. He also testified that Tanner admitted during the June 7 interview that she had gone to the bar with Cady on the night Watson was killed and that her fingerprints would likely be found on the murder weapon because she had used it a week before the murder to do drugs.

The prosecution argued that it had established probable cause.  The state district court agreed, and summarized its reasoning as follows:

> [Tanner's] false statements to [Walters] concerning her whereabouts in her initial statement, the fact that her blood matches within 4 percent of the population, the fact that it is her knife that was found in close proximity to the bloodstain that was left probably by the perpetrator that matches her, the fact that she was at Barney's at 1:30 a.m. in the morning, all those facts combined together in the [c]ourt's mind does establish probable cause.

(R. 100, PageID 1134).

*Tanner Is Convicted and Released.*  Tanner was tried in the Calhoun County Circuit Court and convicted by a jury in November 2000.  *Tanner*, 867 F.3d at 662, 670.  After an unsuccessful state court appeal, Tanner filed a federal habeas petition in the Eastern District of Michigan which was denied.  *Tanner v. Yukins*, No. 04-CV-71155-DT, 2005 WL 2994353 (E.D. Mich. Nov. 7, 2005).  This court reversed and remanded with directions to set aside Tanner's conviction, finding that her conviction lacked sufficient evidentiary support.  *Tanner*, 867 F.3d at 674.

Tanner filed this lawsuit pursuant to 42 U.S.C. § 1983 against Walters, alleging violations of her constitutional rights premised on his fabrication of evidence, malicious prosecution, and failure to produce exculpatory evidence as required by *Brady v. Maryland*, 373 U.S. 83 (1963).  She also named the City of Battle Creek as a defendant, but subsequently stipulated to the City's dismissal.  Walters moved for summary judgment as to each claim based on qualified immunity.  The district court granted Walters summary judgment on the *Brady* claim but denied the motion as to Tanner's claims for fabrication of evidence and malicious prosecution.  Walters timely appealed.

## II.

We review de novo a district court's denial of summary judgment on qualified immunity grounds.  *See Adams v. Blount Cnty.*, 946 F.3d 940, 947 (6th Cir. 2020).  Government officials performing discretionary functions are entitled to qualified immunity from civil liability "when their conduct 'does not violate clearly established statutory or constitutional rights of which a

reasonable person would have known.'" *King v. Harwood*, 852 F.3d 568, 582 (6th Cir. 2017) (quoting *White v. Pauly*, 580 U.S. 73, 78–79 (2017)). To determine whether an officer is entitled to qualified immunity, we employ a two-part inquiry which asks: "(1) whether the facts, when taken in the light most favorable to the party asserting the injury, show the officer's conduct violated a constitutional right; and (2) whether the right violated was clearly established such 'that a reasonable official would understand that what he is doing violates that right.'"[1] *Mullins v. Cyranek*, 805 F.3d 760, 765 (6th Cir. 2015) (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)). The court may consider the questions in whichever order it concludes makes the most sense. *Pearson v. Callahan*, 555 U.S. 223, 227 (2009). "When a defendant invokes qualified immunity in a motion for summary judgment, the plaintiff must offer sufficient evidence to create a genuine dispute of fact that the defendant violated a clearly established right." *Folks v. Petit*, 676 F. App'x 567, 569 (6th Cir. 2017) (citing *DiLuzio v. Vill. of Yorkville*, 796 F.3d 604, 608–09 (6th Cir. 2015)).

Pursuant to 28 U.S.C. § 1291, appellate courts may review "appeals from all final decisions of the district courts." A district court's denial of qualified immunity is an appealable final decision to the extent the appeal presents purely legal questions. As the Supreme Court explained in *Johnson v. Jones*, qualified immunity rulings are reviewable on interlocutory appeal to the degree they present "a legal issue that can be decided with reference only to undisputed facts and in isolation from the remaining issues of the case." 515 U.S. 304, 313 (1995) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 529 n.10 (1985)). In this vein, we "may overlook a factual disagreement if a defendant, despite disputing a plaintiff's version of the story, is 'willing to concede the most favorable view of the facts to the plaintiff for purposes of the appeal.'" *Adams*, 946 F.3d at 948 (quoting *Barry v. O'Grady*, 895 F.3d 440, 443 (6th Cir. 2018)). We may also review factual determinations that are "blatantly contradicted by the record, so that no reasonable jury could believe [them]." *Id.* (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).

As set forth below, this interlocutory appeal presents both legal and factual disputes. We limit our review to purely legal issues within our appellate jurisdiction.

---

[1]Walters's appeal only challenges the district court's ruling as to the first prong. We therefore limit our review to that inquiry.

## III.

### A.

*Fabrication of Evidence.*  For purposes of this appeal, Walters concedes the view of the facts most favorable to Tanner.  That is, he accepts Tanner's assertions that he (1) included false information in his reports describing his investigative interviews with her; and (2) testified falsely about her statements to him at her preliminary examination hearing.  Walters nevertheless maintains that the district court wrongly denied him summary judgment on Tanner's fabrication-of-evidence claim.  He argues that Tanner is required to do more than come forward with evidence contradicting his testimony and written statements to establish fabrication of evidence; she must first establish that he intentionally or recklessly misrepresented her statements pursuant to *Sykes v. Anderson*, 625 F.3d 294 (6th Cir. 2010).  And to satisfy this first requirement, according to Walters, Tanner must make a "substantial showing" of the requisite intent or recklessness to prevail.  He draws this "substantial showing" requirement from the court's jurisprudence relating to § 1983 claims for unlawful arrest under the Fourth Amendment where the arrest is based on false statements by law enforcement officers.  *Sykes*, 625 F.3d at 305.  In such cases, we have employed the rationale underlying the Supreme Court's decision in *Franks v. Delaware*, which requires a hearing at the defendant's request if the defendant can make a substantial preliminary showing that an officer included a "deliberate falsity" or with "reckless disregard for the truth" included a false statement in a search warrant affidavit that was necessary to the finding of probable cause.  438 U.S. 154, 171–72 (1978).

Walters' argument fails for at least two reasons.  First, Walters overstates the showing necessary for Tanner's claim.  Purposefulness is not an element of a standalone fabrication-of-evidence claim.  Rather, a plaintiff must show that the defendant "knowingly fabricated evidence against [a plaintiff], and [that] there is a reasonable likelihood that the false evidence could have affected the judgment of the jury."  *Mills v. Barnard*, 869 F.3d 473, 484 (6th Cir. 2017) (alterations in original) (quoting *Stemler v. City of Florence*, 126 F.3d 856, 872 (6th Cir. 1997)).  Such claims are rooted in the Due Process Clause of the Fourteenth Amendment, so they are understandably focused on the adjudicative process—in particular, the potential effect of knowingly fabricated evidence on the trier of fact—not on the purpose of the publisher of such

statements. *See Anderson v. Knox Cnty.*, No. 22-5280, 2023 WL 4536078, at *8 (6th Cir. July 13, 2023) (distinguishing fabrication-of-evidence claims from malicious prosecution claims and acknowledging that the former violates a defendant's right to a fair trial as guaranteed by the Fourteenth Amendment's Due Process Clause). Second, we have not previously required a "substantial showing" of intent for such claims. Instead, any mention of intentional conduct—what we sometimes refer to as "deliberate falsehood"—or the "substantial showing" standard appears in instances where false information is "material to the finding of *probable cause*." *See Vakilian v. Shaw*, 335 F.3d 509, 517 (6th Cir. 2003) (emphasis added). Because a stand-alone fabrication-of-evidence claim can survive without regard to probable cause, it follows that such a showing is unnecessary. *See France v. Lucas*, 836 F.3d 612, 629 (6th Cir. 2016) ("A plaintiff does not need to show that the government lacked probable cause to prevail on a fabrication of evidence claim." (citing *Stemler*, 126 F.3d at 872)). Thus, Walters's argument premised on the requirement for such a showing for a fabrication of evidence claim lacks merit.

Here, Tanner says Walters's statements that she told him: (1) the knife belonged to her; (2) her fingerprints would be found on the knife; (3) she knew it was her knife because of the chip in it; (4) she was at Barney's on the night in question; and (5) she "could do something" like the murder if the victim "gave her a hard time" were fabrications. (ECF 21, Appellee's Br. 11). The transcript of the May 24 interview supports her claim of falsity as none of the challenged statements appear in the transcript. Indeed, the transcript reflects that Tanner denied that the knife was hers and that she denied traveling to Barney's on the night of the murder. In view of Walters's concession that we may construe all facts and make all reasonable inferences in the light most favorable to Tanner, we disregard Walters's assertion that he possessed no "information that contradicted" his version of events. (ECF 17, Appellant's Br. 20). And when we credit Tanner's account that she never made any of the statements at issue, Walters's testimony and notes about his interview stating otherwise strongly suggest that he knowingly fabricated the statements. Because a reasonable jury could reach the same conclusion, Walters is not entitled to qualified immunity on Tanner's fabrication-of-evidence claim.

B.

*Malicious Prosecution.* Tanner's malicious prosecution claim is premised on the same facts underlying her claim for fabrication of evidence—that Walters falsified his notes about what she told him and testified falsely about her statements. Walters contends, however, that the claim fails because Tanner cannot show that he "made, influenced, or participated in the decision to prosecute." (ECF 17, Appellant's Br. 23 (quoting *Mills*, 869 F.3d at 480)).

Claims stemming from a plaintiff's seizure and continued detention based on purportedly false or fabricated evidence presented by law enforcement fall under the broad umbrella of malicious prosecution and are rooted in the protections afforded by the Fourth Amendment. *See Gregory v. City of Louisville*, 444 F.3d 725, 747–50 (6th Cir. 2006). Such claims require a plaintiff to prove that: "(1) the defendant made, influenced, or participated in the decision to prosecute the plaintiff; (2) there was no probable cause for the prosecution; (3) as a consequence of the legal proceedings, the plaintiff suffered a deprivation of liberty apart from the initial arrest; and (4) the criminal proceeding was resolved in the plaintiff's favor." *France*, 836 F.3d at 625 (citing *Sykes*, 625 F.3d at 308–09). And while actual "malice" is not required to succeed on a malicious prosecution claim, a defendant must have made "deliberate or reckless falsehoods"; "mere negligence" will not create liability. *See Johnson v. Moseley*, 790 F.3d 649, 654–55 (6th Cir. 2015). Here, neither party disputes Tanner's satisfaction of the last two elements. But Walters challenges part of the first prong—the decision to prosecute—and the second prong in its entirety.

1.    Decision to Prosecute

The fact that an officer "did not make the decision to prosecute does not per se absolve [the officer] from liability." *Sykes*, 625 F.3d at 311 (emphasis omitted). Liability, for instance, "extends to an officer who included falsehoods in [his] investigatory materials, knowing that prosecutorial reliance is likely, where those materials actually influenced the prosecutor's ultimate decision to bring charges." *Jones v. City of Elyria*, 947 F.3d 905, 918 (6th Cir. 2020) (citing *Jackson v. City of Cleveland*, 925 F.3d 793, 820–21 (6th Cir. 2019)).

The district court in this case found that the assistant prosecutor reviewed the case file on Watson's murder and brought it to the attention of the lead prosecutor who authorized charges against Tanner. The district court also found that the assistant prosecutor recalled that Tanner had made some incriminating statements during her interview with Walters and that both he and the lead prosecutor read and discussed Walters's investigatory report before initiating charges against Tanner. Viewing this evidence in the light most favorable to Tanner, the district court concluded that a reasonable jury could find that Walters's investigation report influenced the decision to charge Tanner.

We agree. First, consider the prosecuting attorney's affidavit. Walters notes that the affidavit does not explicitly include Walters's false statements as one of the reasons for moving forward with the prosecution. But this argument is unpersuasive. Paragraph 5 of the prosecutor's affidavit reads in relevant part:

> My review of the Sharon Watson murder case file did not reveal any involvement by David Walters . . . regarding authorizing charges in this case *other than the interviews he had conducted that were contained within the submitted information.*

(R. 93-27, PageID 889) (emphasis added). The false statements at the center of this appeal include the written statements Walters made about Tanner's alleged incriminating admissions during the interviews he conducted. It follows then, construing the affidavit in the light most favorable to Tanner, that a reasonable jury could find that Walters's false statements influenced the prosecutor's decision to bring charges. *See Sykes*, 625 F.3d at 316. Likewise, a jury reasonably could conclude that Walters's false statements "were material to the state court's decision to bind the Plaintiff[] over for trial," *id.* at 313, because the state trial court explicitly stated that Walters's statements were "credible" and were a "basis" for its probable cause determination at the preliminary hearing. (R. 100, PageID 1129).

    2.    Probable Cause

Walters next challenges the district court's finding that there remains a triable issue on whether Tanner established a lack of probable cause. First, he contends that the state court's probable cause determination precludes Tanner from relitigating probable cause. Second, he

maintains that probable cause existed even without Walters's false statements. Third, he argues that the district court applied the wrong standard in assessing probable cause. Each of these arguments fails.

For starters, Walters's collateral estoppel argument does not align with Michigan law. "The preclusive effect of a state court judgment is determined by state law." *Peterson v. Heymes*, 931 F.3d 546, 554 (6th Cir. 2019). Under Michigan law, "crossover estoppel" "precludes the relitigation of an issue from a criminal proceeding in a subsequent civil proceeding, and vice versa." *Id.* (citing *Barrow v. Pritchard*, 597 N.W.2d 853, 855–56 (Mich. Ct. App. 1999)). But when a criminal judgment has been vacated, the trial court's interlocutory rulings merge with the final judgment and are vacated as well. *Id.*; *see also Dodrill v. Ludt*, 764 F.2d 442, 444 (6th Cir. 1985) (stating that a vacated judgment "technically leav[es] nothing to which we may accord preclusive effect").

The district court found that Tanner presented sufficient evidence to show that the state court relied on Walters's false statements at the P.E. in making its probable cause determination. Walters says *Peterson* is distinguishable in that the probable cause finding against Tanner was not vacated when her criminal conviction was vacated because the probable cause adjudication was the product of a separate, valid, final judgment. He says this is so because her P.E. was conducted in a district court, while her trial occurred in one of the state's circuit courts. But Walters cites no binding authority to support this proposition, and we are not otherwise persuaded that Tanner is collaterally estopped from relitigating this issue. *See Hinchman v. Moore*, 312 F.3d 198, 202–03 (6th Cir. 2002) ("[A] finding of probable cause in a prior criminal proceeding does not bar a plaintiff in a subsequent civil action from maintaining a claim for malicious prosecution under Michigan law where the claim is based on a police officer's supplying false information to establish probable cause."). Indeed, Walters concedes that "Tanner can avoid preclusion only if she can point to evidence that the claim of malicious prosecution is based on a police officer's supplying false information." (ECF 17, Appellant's Br. 25–26). As we have discussed, considering all facts in the light most favorable to Tanner, a reasonable jury could conclude that the state court relied on Walters's false statements for its probable cause determination.

Walters insists, however, that probable cause to prosecute Tanner still would have existed even if he had not made any false statements and that the district court applied the wrong standard. "Probable cause exists if the facts and circumstances known to the officer warrant a prudent man in believing that the offense has been committed." *Henry v. United States*, 361 U.S. 98, 102 (1959). To be sure, without Walters's false statements, the prosecutor could have marshaled other evidence, such as Tanner's failed polygraph examination, blood found at the scene matching Tanner's blood type, and a statement from a jailhouse informant that Tanner allegedly admitted she went to Barneys on the night of Watson's murder. Yet, none of this evidence demands a finding of probable cause. A failed polygraph alone is insufficient to support a probable cause determination. *See Tomasik v. Martin*, No. 22-1081, 2023 WL 2137354, at *5 (6th Cir. Feb. 21, 2023). And as to the latter two items, "[m]illions of people share Tanner's blood type," *Tanner*, 867 F.3d at 673, the crime scene was contaminated prior to collection of the blood sample, and Tanner denied making the statement to the inmate. Taking all facts and making all reasonable inferences in the light most favorable to Tanner, a reasonable jury could find that these facts, without Walters's statements, would not have provided probable cause to prosecute Tanner.

*Substantial Showing.* Like his argument relating to Tanner's stand-alone fabrication-of-evidence claim, Walters again insists that Tanner must make a "substantial showing" that he stated a deliberate falsehood or showed reckless disregard for the truth to maintain a § 1983 claim for malicious prosecution. *See Johnson*, 790 F.3d at 654–55. He contends that the district court erred when it denied him qualified immunity because there is no evidence from which a reasonable jury could conclude that he knowingly or recklessly fabricated evidence. Implicit in his argument is an assumption that the district failed to find such a showing. But we do not agree that it did. Even if Walters is correct that Tanner must make a "substantial showing" in this context, the record here contains sufficient evidence for a jury to find that Tanner has satisfied that standard. *See Caskey v. Fenton*, No. 22-3100, 2022 WL 16964963, at *8 (6th Cir. Nov. 16, 2022) (cautioning against "misconstru[ing] the height of [the substantial showing] requirement," which can be met by "an offer of proof" (quotation omitted)). In *Butler v. City of Detroit*, we stated that "[a] plaintiff shows substantial evidence of deliberate falsehood or reckless disregard when, for example, he presents proof that at the time the officer swore out the affidavit, she knew

of or possessed information that contradicted the sworn assertions." 936 F.3d 410, 419 (6th Cir. 2019). We reasoned that "such a showing gets the § 1983 plaintiff past the qualified-immunity hurdle because it shows that no reasonable officer with access to the contradictory information would have sworn out such an affidavit." *Id.* (citing *Vakilian*, 335 F.3d 509). Here, looking at the transcript and audio of the May 24 interview and making all reasonable inferences in the light most favorable to Tanner, Tanner has presented evidence that Walters possessed information that contradicted his statements. Even though Walters did not have the transcript of his interview when he testified at the probable cause hearing, he knew that the audio of the interview existed because he recorded it himself. A reasonable jury could find by a substantial showing that Walters made his statements in a deliberate falsehood or with reckless disregard for the truth. His claim of qualified immunity, therefore, fails.

**IV.**

For the reasons discussed, we AFFIRM.