NOT RECOMMENDED FOR PUBLICATION
File Name: 25a0266n.06

Case No. 24-1375

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

NANCY HOOKS,

        Plaintiff - Appellee,

v.

CITY OF WARREN, MICHIGAN,

        Defendant,

LUCAS DOE and BRYAN MUNAFO, Officers; ANTHONY GIANNOLA; MARCHELLOE DELOS BROWN,

        Defendants - Appellants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

FILED
May 30, 2025
KELLY L. STEPHENS, Clerk

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN

OPINION

Before: COLE, McKEAGUE, and RITZ, Circuit Judges.

**RITZ, Circuit Judge.** In April 2019, 57-year-old Nancy Hooks stopped her car in Warren, Michigan to assist a teenage victim of a street fight. She stayed on the scene to help police officers locate the mob who had beaten him. Police officers dismissed her help, calling her a "white trash bitch." Hooks then pulled out her cell phone and walked away, apparently to film the officers. The police chased after her, telling her to leave. But as Hooks was walking away, an officer approached her, causing her to throw up her arm. The officer slammed Hooks to the ground, handcuffed her, and took her away.

Hooks was prosecuted in Michigan state court for "hindering," and a jury acquitted her. She then sued the officers, the City of Warren, and the Warren Police Department in federal court, alleging claims under 42 U.S.C. § 1983 and Michigan law. The defendants moved for summary judgment on various grounds, and the district court granted in part and denied in part their motion.

The officers now appeal the portions of the order denying them summary judgment. For the following reasons, we dismiss this appeal for lack of jurisdiction and remand for further proceedings in the district court.

**BACKGROUND**

Where the district court has "correctly applied the standard for summary judgment" in a § 1983 case, we may "adopt the district court's recitation of the facts, including casting them in the light most favorable to" the plaintiff. *Gillispie v. Miami Township*, 18 F.4th 909, 912 (6th Cir. 2021) (citations omitted). We do so here.

In the early evening of April 8, 2019, Nancy Hooks, then 57 years old, was driving south on Lorraine Avenue in Warren, Michigan, to visit a friend. While en route, Hooks saw police cars leaving the intersection of Lorraine and Ford Street. Hooks stopped her car to speak with another friend who was standing near the intersection, and this friend told her that the police had arrested someone for shooting a gun. Not long after Hooks stopped, a group of fifteen to twenty teenagers ran through the intersection and started beating a teenage boy.

Hooks reported the altercation to 911 and got out of her truck to tell the boy that help was on the way. Meanwhile, the group of teenagers ran away. Approximately five minutes after Hooks called 911, police and other first responders arrived. Responding police officers included defendant-appellant Officers Marchelloe Brown, Anthony Giannola, Lucas Doe, and Bryan Munafo.

What happened after police officers converged on the scene at Lorraine and Ford is the subject of dispute. Some of what occurred is captured in two videos: dashcam footage from Brown's police car and cellphone footage taken by a bystander. Neither of these videos completely

corroborates either party's account, but they are useful in determining what happened and where the parties' stories diverge.

## I.     The dashcam video

Brown's dashcam video footage shows approximately ten to fifteen people, including officers, when he arrived at the intersection of Ford and Lorraine.  Brown claims that, when he arrived, there were "well in excess of 100 people" on the scene "arguing with officers."  RE 36-3, Trial Tr. – Vol. 1, at PageID 454.  He also claims that "fights were breaking out" and that he had to "assist other officers."  RE 36-10, Brown Dep., at PageID 682.  For her part, Hooks claims there were no other fights or shouting happening when officers arrived and only between thirty to forty people present.  Because of its limited vantage point, the dashcam footage does not confirm or refute either account.

The dashcam video then shows Brown and Giannola walking toward the group of people clustered at the intersection.  Hooks, who is wearing a pink shirt and a dark jacket, approaches them.  Hooks tells the officers that she was a witness to the fight.  The officers instruct her to move to the side so that they can make sure nobody has a weapon, and Hooks responds: "You're not even looking for the kids. . . . They're already on that block right there."  Ex. 11 to Defs.' Mot. for Summ. J., at 05:00-18.  An officer asks Hooks what the suspects looked like, and when Hooks responds, the officer says, "That doesn't really narrow it down."  *Id.* at 05:22-27.  Hooks then tells the officers again that she was a witness to the fight and the location where the group of teenagers ran.

As this exchange occurs, another woman comes up to the group to tell officers that they nearly hit her and her daughter with one of their cars.  Giannola tells her to "get the fuck off the street then," at which point the woman starts yelling.  *Id.* at 05:48-6:00.  One can hear an officer

say, "Get in your house. You're not going to be told again. You can shut the fuck up." *Id.* at 06:00-22. The dashcam video then shows people leaving the intersection, but Hooks stays behind to try to continue to speak with officers. At one point, she goes over to speak with a motorcyclist in the intersection, and then returns to the huddled officers.

Finally, Hooks is able to approach Giannola one-on-one in the intersection. The two appear to speak. Hooks then backs up from Giannola and walks past him as if to walk away. Next, she turns as if she has heard him say something to her and says, "Bitch? White trash?" *Id.* at 07:20-49. In her deposition, Hooks testified that Giannola called her a "white trash bitch." RE 36-12, Hooks Dep., at PageID 752. On the video, Hooks is told to "go home" and "walk away," but Hooks says that she is "57 years old, [and] you're not gonna call me white trash." Ex. 11 to Defs.' Mot. for Summ. J., at 07:49-57.

Hooks then walks away from the officers toward a small group of approximately five people who are standing on the corner. She takes out her phone and tells the officers that she is going to call their sergeant. Officers tell her to "go home" and to "[k]nock yourself out." *Id.* at 08:06-30.

Hooks next walks away from the group of officers and toward her truck. She pauses once she has nearly crossed the street, turns around, and takes out her phone. Officers notice her filming them and turn to chase her away, telling her to "Go!" *Id.* at 08:41. Hooks complies and walks away toward her truck. Two officers, however—Doe and Munafo—are already walking toward her. Brown says to them, "[I]f she doesn't leave—she can go!" *Id.* at 08:43-44.

The view of Hooks in the dashcam footage is not clear at this point because the car is parked some distance away. But seconds later, officers tackle her to the ground and there is a noisy commotion from the crowd, shouting "Whoa, whoa!" *Id.* at 8:47-49. Hooks lies on the

ground with several police officers on top of or immediately surrounding her. Police officers pick her up and march her away from the camera.

## II.     The bystander video

Cellphone footage taken from a different angle by a bystander provides a somewhat clearer view of Hooks in this latter minute. This video also shows approximately seven to ten people on the street corners (aside from police officers) after the crowd has thinned out. On the video, Hooks walks backwards away from officers, speaks to people standing in a yard, and then takes out her phone. The camera pans away, but when it returns to Hooks, she is standing in the street across from the police officers and we can see an officer approach and say something to her. Hooks walks away from the officer; she then stops, turns around, and pulls out her cellphone to film. The bystander moves closer to Hooks. Officers chase Hooks and yell, "Go!", at which point Hooks turns around with her phone lowered and walks away. Ex. 12 to Defs.' Mot. for Summ. J., at 0:48-50. The camera then pans away again. Officers can be seen walking and saying, "She can go!" *Id.* at 0:50-52.

When the camera re-focuses on Hooks, the video shows that, as Doe and Munafo meet Hooks, Doe tries to grab her. One cannot tell from the video whether he says anything to her. Hooks pulls away and raises her left hand—in what she characterizes as a startle or reflex and what Doe took to be a fighting stance. Doe then grabs Hooks around her collarbone, pulls her down backwards onto the ground, and gets on top of her. Bystanders are immediately heard saying, "Hey, hey! That is not right." *Id.* at 0:57. Two other officers assist Doe, handcuffing Hooks and taking her away from the scene.

Hooks claims that her pants fell down around her ankles as a result of this encounter and officers would not assist her in pulling them back up. Once Hooks is handcuffed and being dragged

away, the bystander who is filming is farther away from her, having been pushed back by officers, so it is unclear from the footage whether her pants had fallen down. The camera eventually loses sight of her.

### III. State and federal proceedings

Hooks was charged with the municipal offenses of failing to obey a lawful command and hindering police officers. *See* Warren Mun. Code, Ch. 22, Art. II § 22-22 (hindering officers and employees), available at https://perma.cc/M78A-7VKF; *id.* § 22-23 (obeying lawful command of police officers), available at https://perma.cc/M78A-7VKF. Her husband was not able to post bond immediately, so Hooks spent four days in jail. Prosecutors dismissed the charge of failing to obey a lawful command. Hooks went to trial on the charge of hindering police officers, at which Brown, Giannola, and Doe testified, and the two videos were introduced into evidence. The jury returned a verdict of not guilty.

Hooks then filed this lawsuit against the City of Warren, the City of Warren Police Department, and Officers Doe, Munafo, Giannola, and Brown, as well as another officer.[1] She asserted eleven causes of action under state and federal law. The district court granted summary judgment for the officers and municipal defendants on several of Hooks's claims, but denied summary judgment as to the following: (1) excessive force under 42 U.S.C. § 1983 as to Doe (Count 1); (2) unlawful arrest under § 1983 as to Doe and Munafo (Count II); (3) state-law battery against Doe (Count VII); (4) state-law intentional infliction of emotional distress against Doe and Munafo (Count IX); and (5) malicious prosecution as to Doe, Munafo, Brown, and Giannola (Count X). The officers filed this timely appeal.

---

[1] The claims against the municipal defendants and the other officer were dismissed, and they are not parties to this appeal.

**ANALYSIS**

**I.      Hooks's § 1983 claims**

The district court determined that Doe and Munafo were not entitled to qualified immunity on Hooks's two claims arising under § 1983: unlawful arrest and excessive force.  To overcome a qualified-immunity defense, the plaintiff must demonstrate that (1) the facts, taken in the light most favorable to her, show that an officer violated her constitutional right, and (2) the right was clearly established at the time of the officer's conduct such that the officer would have understood that he was violating the plaintiff's rights.  *Tanner v. Walters*, 98 F.4th 726, 731 (6th Cir. 2024).  Summary judgment is properly denied when a plaintiff has offered evidence sufficient to raise a genuine dispute of material fact as to whether the officer violated her clearly established rights.  *Id.*; *see* Fed. R. Civ. P. 56(a).  We review de novo the district court's denial of summary judgment on qualified-immunity grounds.  *Tanner*, 98 F.4th at 731.  "An order denying summary judgment is not typically a 'final decision' that we have jurisdiction to review under 28 U.S.C. § 1291."  *Heeter v. Bowers*, 99 F.4th 900, 908 (6th Cir. 2024) (citing *Plumhoff v. Rickard*, 572 U.S. 765, 771 (2014)).  But to the extent that the denial of summary judgment is the denial of qualified immunity, the rules are "a bit different[]."  *Id.*  "When a defendant official is entitled to qualified immunity . . . , it means they are entitled to not stand trial for their actions."  *Id.*  Therefore, "[a] summary-judgment order denying this immunity from suit is essentially a final order as to that entitlement . . . warrant[ing] immediate appeal under the collateral order doctrine."  *Id*.  But "[a] district court's denial of qualified immunity is an appealable final decision under 28 U.S.C. § 1291 . . . only 'to the extent that it turns on an issue of law.'"  *Estate of Carter v. City of Detroit*, 408 F.3d 305, 309 (6th Cir. 2005) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985)).

"[C]ourts of appeals have jurisdiction to hear an appeal of a qualified-immunity denial only when the appeal presents a purely legal question." *Barry v. O'Grady*, 895 F.3d 440, 443 (6th Cir. 2018) (citing *Estate of Carter*, 408 F.3d at 310). As the Supreme Court made clear in *Johnson v. Jones*, 515 U.S. 304 (1995), a defendant raising a qualified-immunity defense "may not appeal a district court's summary judgment order insofar as that order determines whether or not the pretrial record sets forth a 'genuine' issue of fact for trial." *Id.* at 319-20. That is, if an appeal from denial of qualified immunity turns on a disputed issue of fact, then "we may not exercise jurisdiction." *Barry*, 895 F.3d at 443 (citing *Johnson*, 515 U.S. at 319-20). Beyond factual determinations, "a defendant [also] may not challenge the inferences that the district court draws from those facts, as that too is a prohibited fact-based appeal." *Adams v. Blount County*, 946 F.3d 940, 948 (6th Cir. 2020) (quoting *Barry*, 895 F.3d at 443).

Our court has recognized two exceptions to this rule, however. First, we may exercise jurisdiction and "overrule a district court's determination that a factual dispute exists where evidence in the record establishes that the determination is blatantly and demonstrably false." *Barry*, 895 F.3d at 443 (internal quotation marks omitted) (quoting *Austin v. Redford Twp. Police Dep't*, 690 F.3d 490, 496 (6th Cir. 2012)). When a party's recollection of the facts is contradicted by undisputed video or audio records, for example, we need not accept the non-movant's version of events. *See Scott v. Harris*, 550 U.S. 372, 380-81 (2007).

Second, we may exercise jurisdiction if, despite a factual disagreement, the defendant is "willing to concede the most favorable view of the facts to the plaintiff for purposes of the appeal." *Barry*, 895 F.3d at 443 (quoting *Phelps v. Coy*, 286 F.3d 295, 298 (6th Cir. 2002)). But the concession must be genuine. *See Anderson-Santos v. Kent County*, 94 F.4th 550, 554-55 (6th Cir.

2024) (declining to exercise jurisdiction where the defendant purported to concede the plaintiff's views, but "in effect still litigate[d] the factual dispute").

Some of our cases have noted that we *may* "ignore the defendant's attempts to dispute the facts and nonetheless resolve the legal issue" of "whether the facts alleged support a claim of violation of clearly established law," and therefore avoid having to "dismiss the entire appeal for lack of jurisdiction." *Estate of Carter*, 408 F.3d at 310 (cleaned up); *see also Quigley v. Tuong Vinh Thai*, 707 F.3d 675, 680 (6th Cir. 2013) (defendant's "improper [factual] arguments and the basis of the district court's decision do not *necessarily* prevent us from having jurisdiction over [his] appeal" (emphasis added)). But if "disputed factual issues are crucial to a defendant's interlocutory qualified immunity appeal, we may not simply ignore such disputes; we remain obligated to dismiss the appeal for lack of jurisdiction." *Adams*, 946 F.3d at 951 (cleaned up).

## A.    Unlawful arrest

We first determine whether we have jurisdiction over the officers' appeal from the denial of qualified immunity on the unlawful-arrest claim. The district court correctly noted that, to proceed to trial on this claim, Hooks needed evidence that officers lacked probable cause to arrest her for the two municipal infractions. The court reviewed the evidence in the light most favorable to Hooks and concluded that "the available video evidence is not clear enough to resolve any of the factual disputes one way or another." RE 45, Opinion & Order, at PageID 1139. In particular, the district court found that the dashboard video neither confirmed nor refuted whether the scene at the corner of Ford and Lorraine was "controlled or chaotic," meaning that the district court could not verify whether the officers were correct in asserting that fifty to one hundred people were yelling and fighting. *Id.* The court also noted that the video did not show clearly whether Hooks herself was yelling. *Id.* at PageID 1140. Next, the court found that the "footage is even less clear"

whether Hooks was disobedient after her one-on-one encounter with Giannola, in which he called her a "white trash bitch." *Id.* Although the officers claimed that Hooks screamed and riled up the crowd when they told her to leave, the district court found that this was not captured clearly on video. Hooks, for her part, stated that she simply told the officers that she was going to call their sergeant and started to leave.

Next, the district court addressed Officer Brown's command, "She can go!", to Officers Doe and Munafo. *Id.* at PageID 1141. According to the district court, a jury could reasonably conclude that Doe and Munafo "ignored a directive to allow Hooks to leave," because it was not intuitive that "She can go!" meant "Stop, you are under arrest." *Id.* Finally, the district court evaluated the officers' claim that they had probable cause to arrest Hooks when she resisted Doe's efforts to detain her. The video footage was not clear whether Hooks was obviously resisting arrest and tried to strike Doe, or whether she "simply startled and reflexively jerked away at unexpected physical contact." *Id.* at PageID 1142.

The district court evaluated the two competing versions of the facts: "[T]he officers' version of the events regarding the state of the scene and Hooks's conduct" and "Hooks's account that she was complying with commands and simply trying to film from a distance." *Id.* at PageID 1141. Because the videos did not corroborate or refute either account, the district court accepted Hooks's version of the facts—as it was required to do at the summary-judgment stage—and denied qualified immunity to Doe and Munafo with respect to Hooks's unlawful-arrest claim.

In their appellate briefing and at oral argument, Doe and Munafo purported to accept Hooks's version of the facts. Yet they maintain that they had probable cause to arrest Hooks because she admitted that she was ordered to leave the scene and go home at least six times, but failed to comply. With respect to whether Hooks was walking away at the time of arrest, the

officers concede that she "initially" complied with their orders, but contend that "what actually occur[ed] here" is that Hooks stopped walking toward her truck and turned around.

The officers' argument on appeal boils down to a factual dispute about whether Hooks was in fact leaving the scene—that is, *complying* with their orders—when she was arrested. The officers argue that the district court erred in failing to recognize that Hooks turned around, so, according to them, she was not actually leaving. Hooks does not dispute that she was told to leave, but argues she *was* leaving when she was arrested. Whether Hooks was complying with orders to leave is a "crucial" fact in the unlawful-arrest analysis because one of the infractions with which she was charged was failure to obey a lawful command. The other charge, hindering, criminalizes "resist[ing]" police "in the performance of their duties." RE 45, Opinion & Order, at PageID 1133, 1136; RE 36-4, Misdemeanor Compl., at PageID 581.

Such a dispute over a crucial factual issue deprives us of jurisdiction on this issue. *See, e.g.*, *Gillman v. City of Troy*, 126 F.4th 1152, 1160 (6th Cir. 2025) (declining to exercise jurisdiction where defendant was "[un]willing to genuinely concede [plaintiff's] version of the facts"); *Gillispie*, 18 F.4th at 918 ("This repeated refusal to accept [plaintiff's] version of the facts is fatal to [the officer's] appeal."). Given that the officers' arguments depend on their version of the facts, we can exercise appellate jurisdiction only if the district court's factual determinations are "blatantly contradicted by the record." *Scott*, 550 U.S. at 380. Doe and Munafo contend that the video footage clearly shows that Hooks disobeyed police orders and, therefore, the district court's determination that a factual dispute exists is "blatantly and demonstrably false." CA6 R. 34, Reply Br., at 2, 7 (citing *Austin*, 690 F.3d at 496). But the videos are not clear. They do not show us whether Hooks was warned or even understood that she would be arrested, whether she resisted Doe's attempt to arrest her, or whether she was interfering with the investigation by

inciting the crowd. And a reasonable juror viewing the videos could conclude that they show Hooks walking away when she was arrested, not refusing to walk away.

At oral argument, the officers took the position that *Scott* requires a "frame-by-frame" analysis of the moment of arrest captured in the videos. They argue that, when viewed frame by frame, the videos show Brown gave Doe a clear directive to arrest Hooks ("She can go!"); Hooks was surrounded on two sides by police officers; and Hooks was thus aware that she was being arrested at the time that she finally complied with officers' orders. Therefore, they argue, it is impossible to say that Hooks was complying with orders at the time she was arrested, because she knew she was under arrest before she started to walk away.

Even if this were the only reasonable interpretation of the video (which it is not), we do not read *Scott* as requiring us to analyze the video on a frame-by-frame basis. In *Scott*, the record contained a video of a high-speed chase. 550 U.S. at 378. The Supreme Court summarized the video as depicting the totality of events: a car "racing down narrow, two-lane roads," "swerv[ing] around more than a dozen other cars," "run[ning] multiple red lights," and so on, over "considerable periods of time." *Id.* at 379-80. This led the Court to conclude that the lower court was wrong to characterize the driver as "cautious and controlled." *Id.* at 380. In other words, the court of appeals had interpreted the video incorrectly. *Id.* at 379-80. But the Court did not instruct lower courts to view videos in cases like this one on a "frame-by-frame" basis.

And we have previously rejected such an approach. For example, in *Cunningham v. Shelby County*, 994 F.3d 761 (6th Cir. 2021), an excessive-force case, the district court had relied on "screen shots" of dashcam recordings in analyzing a shooting. *Id.* at 763. We held that the district court erred in relying on these screen shots to decide whether it was objectively reasonable for officers to use lethal force, because the officers' perspective "did not include leisurely stop-action

viewing of the real-time situation that they encountered." *Id.* at 766-67. Doing so, we reasoned, "would violate the teaching of *Graham* [*v. Connor*, 490 U.S. 386 (1989),] against judging the reasonableness of a particular use of force based upon 20/20 hindsight." *Id.* at 766. Under *Cunningham*, then, we should be reluctant to use a "frame-by-frame" analysis of a videotape for purposes of the qualified immunity inquiry. *Accord Longoria v. Pinal County*, 873 F.3d 699, 706-08 (9th Cir. 2017) (in excessive-force claim, deputy's reliance on a single "frozen frame" of video to justify use of force did not provide basis to grant summary judgment in his favor; deputy did not see a frozen frame, but rather saw events as they unfolded in real time). Viewing the videos in this case as a whole, as the Court did in *Scott*, Hooks's version of events is not "utterly discredited." *Scott*, 550 U.S. at 380. So the exception articulated in *Scott* does not permit us to overrule the district court's factual determinations.

Because Doe and Munafo's arguments rely on their version of the facts, and because the district court's determinations are not blatantly contradicted by the record, we lack jurisdiction to resolve their appeal as to the denial of qualified immunity for the federal unlawful-arrest claim.

### B.    Excessive force

For similar reasons, we also lack appellate jurisdiction as to Doe's qualified-immunity defense to the excessive-force claim. The district court correctly noted that Hooks's excessive-force claim hinges on whether the defendants' use of force was "objectively reasonable." RE 45, Opinion & Order, at PageID 1145 (quoting *Graham*, 490 U.S. at 397). In applying that standard, the court properly considered the following factors: "(1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of officers or others; and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight." *Id.* (citing *Sigley v. City of Parma Heights*, 437 F.3d 527, 534 (6th Cir. 2006)).

First, as to the severity of the crime, the district court noted that Hooks was arrested for municipal infractions only, not violent or serious crimes. *Id.* at 1146. Next, the district court concluded that Hooks posed no threat to the safety of officers: she was an unarmed, 150-pound, 57-year-old woman, who was apparently leaving (that is, complying with officers' commands) when she was arrested. *Id.* at PageID 1146-47. Finally, the district court found that the video evidence was unclear as to whether Hooks's arm movement in reaction to being arrested could be fairly interpreted as resisting arrest. *Id.* at PageID 1147. Officer Doe testified that he had said to Hooks, "You're going to jail," and she reacted in a "fighter's stance," but Hooks testified that Doe gave no such warning, instead grabbing at her and causing her to reflexively startle before he slammed her to the ground. *Id.* After having reviewed the video, the district court could not say with certainty that Hooks's reaction when Doe put his hands on her could have reasonably made Doe believe that any "startled" movement was an attempt to strike him. *Id.* at PageID 1147-48. Rather, a reasonable juror could conclude that Hooks did not clearly resist Doe and, therefore, his "decision to slam her on the ground when she startled at his physical contact was unreasonable and excessive." *Id.* at PageID 1148.

On appeal, much like with the unlawful-arrest claim, the officers do not concede the facts in the light most favorable to Hooks. First, they again challenge the district court's conclusion that Hooks appeared to be complying with officers' orders to leave, and they argue that her disobedience provided probable cause for Doe to arrest her. Second, with respect to whether Hooks resisted arrest or posed a threat, the officers argue that the district court ignored the fact that Doe perceived Hooks's actions as threatening and that his perception was reasonable under the circumstances.

As to the first argument, like in the unlawful-arrest claim, the officers' argument hinges on their position that Hooks was not complying with orders to leave when she was arrested. This is a factual disagreement. And whether Hooks was complying with orders to leave is a "crucial" fact in the excessive-force analysis, because it bears on (1) the severity of the crime at issue (that is, whether Hooks committed any crime at all if she was complying with orders) and (2) whether Hooks posed a threat to officers if she was seemingly complying with orders. *See Adams*, 946 F.3d at 951.

As to the second argument, the district court did not ignore the argument that Doe perceived Hooks's actions as threatening. The court acknowledged that the officers would be entitled to qualified immunity "if they could reasonably interpret any of Hooks's actions as an attempt at resistance during a chaotic scene." RE 45, Opinion & Order, PageID 1147. So, the court allowed for consideration of Doe's perceptions. But the video footage did *not* make it "readily apparent" that Hooks's reflexive arm movements were such that Doe *reasonably* could have mistaken them as a threat. *Id.* at PageID 1147-48. Thus, "[a] reasonable juror viewing the footage could conclude . . . that Doe's [actions were] unreasonable and excessive." *Id.* at PageID 1148.

On appeal, the officers challenge these factual inferences that the district court drew. This strips us of jurisdiction to review the denial of qualified immunity for the excessive-force claim. "[A] defendant may not challenge the inferences that the district court draws from [the] facts, as that too is a prohibited fact-based appeal." *Barry*, 895 F.3d at 443 (internal quotation marks omitted); *see also Gillispie*, 18 F.4th at 917 (where nearly all of officer's arguments on appeal consisted of disagreements with not only the plaintiff's facts, but also with "the district court's determinations that multiple genuine disputes of material fact exist[ed]," such challenges were

"unreviewable" on interlocutory appeal).  Thus, we dismiss the appeal as to the federal excessive-force claim.

## II.     Hooks's state-law claims

Hooks's remaining claims—battery, malicious prosecution,[2] and intentional infliction of emotional distress—all arise under Michigan state law.  The officers ask us to exercise pendent appellate jurisdiction over these state-law claims.

"Pendent appellate jurisdiction refers to the exercise of jurisdiction over issues that ordinarily may not be reviewed on interlocutory appeal, but[] may be reviewed on interlocutory appeal if those issues are 'inextricably intertwined' with matters over which the appellate court properly and independently has jurisdiction."  *Summers v. Leis*, 368 F.3d 881, 889 (6th Cir. 2004) (quoting *Chambers v. Ohio Dep't of Human Servs.*, 145 F.3d 793, 797 (6th Cir. 1998)).  But, as set forth above, we lack jurisdiction over the officers' appeal of Hooks's federal § 1983 claims, so the officers cannot succeed on their pendent appellate jurisdiction argument as to the state-law claims.  *Cate v. City of Rockwood*, 241 F. App'x 231, 237 (6th Cir. 2007) (per curiam) ("Exercise of pendent jurisdiction requires proper jurisdiction over the qualified immunity issue." (citation omitted)).  The officers have presented no other basis for us to consider these claims on appeal.  We therefore dismiss the state-law claims for lack of pendent appellate jurisdiction.

## CONCLUSION

For the foregoing reasons, we dismiss this appeal for lack of jurisdiction and remand for further proceedings in the district court.

---

[2] Although the district court appeared to analyze the malicious-prosecution claim as one "under the Fourth Amendment that is distinct from a claim for false arrest," *see* RE 45, Opinion & Order, at PageID 1155 (citing *Sykes v. Anderson*, 625 F.3d 294, 308 (6th Cir. 2010)), Hooks's complaint cited Michigan law in support of this claim.  Hooks clarified at oral argument that she brought this claim under state law only.